**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CANDICE BAILEY o/b/o | § | |
| C.C. (a child), | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:11-CV-04232 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 3). Cross-motions for summary judgment have been filed by Candice Bailey ("Plaintiff," "Bailey"), on behalf of C.C., a minor, and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Defendant's Motion for Summary Judgment, Docket Entry #12); (Memorandum in Support of Defendant's Motion for Summary Judgment and in Response to Plaintiff's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 13); (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry # 15). Each party has responded in opposition to these motions. (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 16); (Plaintiff's Response to Defendant's Cross Motion for Summary Judgment filed June 11, 2012 and Defenda[n]t's Response to Plaintiff's Motion for Summary Judgement [sic] (Corrected) ["Plaintiff's Response"], Docket Entry # 19). After a

review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED**, and that Defendant's motion be **DENIED**.

**BACKGROUND**

On February 13, 2009, Plaintiff Candace Bailey filed an application for Supplemental Security Income benefits ("SSI"), under Title XVI of the Social Security Act ("the Act"), on behalf of her two-year old son, C.C.  (Transcript ["Tr."] at 25, 183).  Bailey claimed that C.C. had been disabled since February 10, 2009, due to diabetes mellitus and asthma.  (Tr. at 25, 28, 183-88, 204).  On March 27, 2009, the SSA denied her application for benefits.  (Tr. at 97, 100).

Plaintiff petitioned the SSA to reconsider that decision, but that request was denied.  (Tr. at 98, 107). On September 23, 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 112-14).  That hearing, before ALJ Allen Erickson, took place on June 25, 2010.  (Tr. at 47).  Bailey appeared and testified at the hearing, and was accompanied by an attorney, Donald Dewberry.  (Tr. at 47).  The ALJ also heard testimony from C.C.'s grandfather, Leon Cavitt.  (Tr. at 83).  C.C. was present at the hearing, but he did not participate.  (Tr. at 47).

Following the hearing, the ALJ engaged in the following three-step, sequential analysis to determine the following factors:  (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a medically "severe" impairment or combination of impairments; and (3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of one of the impairments listed in the regulations that govern the SSA ("Listing").  *See* 20 C.F.R. § 416.924(b)–(d).  At the third step of the analysis, the Commissioner evaluates the child's ability to function in the following six domains:  (1) "acquiring and using information"; (2) "attending and completing tasks"; (3) "interacting and

relating with others"; (4) "moving about and manipulating objects"; (5) "caring for [one]self"; and (6) "health and physical well-being." *Id*. at § 416.926a(b)(1). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, that impairment is deemed "functionally equal" to a Listing. *See id*. at § 416.926a(d). A "marked" limitation is one that is "more than moderate, but less than extreme," and "interferes seriously with [his] ability to independently initiate, sustain, or complete activities." *Id*. at § 416.926a(e)(2)(I). A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." *Id*. at § 416.926a(e)(3)(I). In determining whether a child claimant has a "marked" or an "extreme" limitation, the Commissioner must review all of the evidence of record and "compare [the child's] functioning to the typical functioning of [same-aged children] who do not have impairments." *Id*. at § 416.926a(f)(1); *see id*. at § 416.926a(b).

Based on these principles, as well as his review of the evidence, the ALJ noted that C.C. was an "older infant" when the application for benefits was filed, and "is currently a preschooler," for purposes of the regulations. (Tr. at 28). He found that C.C. had "not engaged in substantial gainful activity since February 13, 2009, the application date." (*Id*.). He also determined that the child suffered from "diabetes mellitus and asthma," and that those impairments were "severe." (Tr. at 29). However, he found that none of C.C.'s impairments, alone or in combination, met, medically equaled, or functionally equaled the requirements of any Listing. (*Id*.). The ALJ further found that C.C. was not limited in his ability to acquire and use information, to attend to and complete tasks, to interact with and relate to others, to move about and manipulate objects, and to care for himself. (Tr. at 31-36). He determined that, although C.C. was limited in the domain of health and physical well-being, this limitation was "less than

marked." (Tr. at 37). Ultimately, he concluded that C.C. "has not been disabled, as defined in the Social Security Act, since February 13, 2009, the date the application was filed." (Tr. at 37).

On September 14, 2010, Bailey requested an Appeals Council review of the ALJ's decision. (*See* Tr. at 19). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. In making its determination, the Appeals Council received additional evidence that had been submitted by Plaintiff's attorney. (Tr. at 5). On September 21, 2011, the Appeals Council denied Bailey's request, finding no applicable reason for a review. (Tr. at 1). With that ruling, the ALJ's findings became final. On November 30, 2011, Bailey filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision to deny her son SSI benefits. (Complaint, Docket Entry #1). Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Plaintiff's motion for summary judgment be GRANTED, that Defendant's cross-motion for summary judgment be DENIED, and that the case be remanded.

**Standard of Review**

Federal courts review the Commissioner's decision to deny disability benefits only to ascertain whether it is supported by substantial evidence and whether the proper legal standards were applied. *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.

1995)).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; subjective evidence of pain and disability; and the claimant's age and education.  *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In her motion for summary judgment, Bailey claims that C.C. is disabled due to "severe diabetes mellitus and asthma."  (Plaintiff's Motion at 4).  She asks the court to reverse the Commissioner's decision and to award him benefits, or in the alternative, to remand this case for further proceedings.  (*Id.* at 1).  First, she contends that the ALJ failed to find that C.C.'s diabetes met or medically equaled the requirements of Listing 109.08.  (*Id*. at 4).  Second, Bailey claims that the ALJ erred in determining that C.C.'s attention deficit hyperactivity disorder (ADHD) was not a "medically determinable or severe impairment."  (*Id*. at 4).  Finally, Bailey complains that the ALJ erred because he found that none of C.C.'s impairments met or functionally equaled a listed impairment.  (*Id*.).  Defendant insists, however, that the ALJ properly considered all of

the evidence, and followed the applicable law, in determining that C.C. is not disabled. (Defendant's Motion at 9); (Defendant's Response at 13).

### *Medical Facts, Opinions, and Diagnoses*

The earliest available medical evidence is from C.C.'s pediatrician, Tuan Nguyen, M.D. ("Dr. Nguyen").  (Tr. at 339-53).  Although the majority of Dr. Nguyen's notes are illegible, it appears that, on September 25, 2008, he found that C.C. suffered from asthma, which was "well-controlled." (Tr. at 346).  On September 9, 2009, C.C. was again treated for asthma by Dr. Nguyen.  (Tr. at 342).  On that date, the doctor recommended that C.C. use a nebulizer[1] with Albuterol.[2]  (Tr. at 342).

Between those two visits, on February 5, 2009, Plaintiff brought C.C. to Dr. Nguyen again, complaining of "freq[uent] thirst[] [and] urination."  (Tr. at 346-47).  Dr. Nguyen ordered a urinalysis, which showed the presence of ketones.[3]  Dr. Nguyen then referred C.C. to the hospital "for urininary frequency[, and] increasing thirst and appetite, with urinary ketone[s] … and glucosuria."[4]  (Tr. at 347).  C.C. was immediately sent to the emergency room at West Houston Medical Center.  (Tr. a 240).

---

[1] A nebulizer is a device for administering "[i]ntranasal medications."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 1086 (5th Ed. 1998).

[2] "Albuterol" is "used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease."  U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html (last visited January 17, 2013).

[3] The presence of ketones in the urine is a common sign of type 1 diabetes.  American Diabetes Association, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-for-ketones.html (last visited January 23, 2013).  "Ketones in the urine is a sign that [the] body is using fat for energy instead of … glucose[,] because not enough insulin is available to use glucose for energy."  *Id*.

[4] "Glucosuria" indicates there is an "abnormal presence of glucose in the urine resulting from the ingestion of large amounts of carbohydrate[s] or from a … metabolic disease, such as diabetes mellitus."  MOSBY'S at 698.

At that hospital, C.C.'s blood glucose reading was 400,[5] and he was transferred to Memorial Hermann Children's Hospital for further evaluation.  (Tr. at 250; see also Tr. at 346-47).  He remained at Memorial Hermann for five days.  During his stay there, C.C. was treated by a number of physicians.  While his neurological system and his extremities were normal, he was diagnosed as suffering from Type 1 diabetes.  (Tr. at 251, 257).  While in the hospital, C.C.'s blood sugar readings ranged from 70 to 495 mg/dl.[6]  (Tr. at 266, 268).  C.C.'s parents received "diabetes education," and his mother learned how to check his blood sugar and administer insulin.  (Tr. at 263).  During his hospital stay, C.C. also began wheezing.  (Tr. at 271).  Adelina Gunawan, M.D. ("Dr. Gunawan") concluded that C.C. suffered from "[a]sthma exacerbation," and prescribed Albuterol.[7]  However, the Albuterol did not improve the wheezing, and Dr. Gunawan then prescribed prednisolone.  As a result, C.C's blood sugar level increased, complicating the ability to "find[] the right insulin dose."  (Tr. at 271).  C.C. was released from Memorial Hermann Children's Hospital, on February 10, 2009, but was to be seen at the pediatric endocrine clinic one week later.  (Tr. at 265).

On February 17, 2009, Michelle Rivera-Davila, M.D. ("Dr. Rivera-Davila") at the University of Texas Health Science Center's Pediatric Endocrinology Clinic began treating C.C.. (Tr. at 292).  On that day, his glucose level was 167 mg/dL.  (Tr. at 292).  Bailey reported checking C.C.'s glucose level five times a day, and she said that the levels ranged from 79 to 429.  (Tr. at 293).  C.C. did "not complain of shortness of breath, wheezing, [or a] cough."  (Tr. at 294).  Dr. Rivera-Davila advised Bailey to "[c]ontinue [C.C.'s] carbohydrate regimen" and to

---

[5] Normal blood glucose levels "for children without diabetes range from 70 to 130 mg/dL."  Normal Blood Glucose For Children, http://www.livestrong.com/article/398768-normal-blood-glucose-for-children/ (last visited January 15, 2013).

[6] "Hypoglycemia" is marked by a glucose reading of "< 70 mg/dl."  (Tr. at 293).  "Hyperglycemia" is "defined as > 240 mg/dl."  (Tr. at 293).

[7] Dr. Gunawan chose Albuterol over prednisolone, because she feared the prednisolone would cause C.C.'s blood sugar level to increase.

contact the office in three to four weeks to review his glucose readings.  (Tr. at 295).  As directed, Bailey called the endocrinology clinic, on March 9, 2009, and reported that C.C.'s blood glucose levels were "looking much better."  (Tr. at 281).  However, the nurse taking the message, Cynthia Hughes, R.N. ("Ms. Hughes"), noted that most of those levels had been recorded "after meals," and she instructed Bailey that all glucose levels should be examined "pre-meal or pre-snack."  (Tr. at 281).  Ms. Hughes asked Bailey to call if she noticed "trends below 70," but Plaintiff called again, on March 12, 2009, to report that C.C.'s glucose numbers "pre-meal" were in the low 100s "(100-139)."  (Tr. at 281, 317).  Based on this information, Ms. Hughes recommended that Bailey decrease C.C.'s "supper dose" of insulin, and "stop" his nighttime dose "to see if [it] w[ould] help [his morning] numbers come up a bit."  (Tr. at 317).

C.C.'s next visit to the endocrinology clinic was on April 23, 2009, and at that time, he had been congested, and exhibited "[d]yspnea, [a] cough, and wheezing."  (Tr. at 315).  Oneka Richardson, M.D. ("Dr. Richardson") diagnosed him as suffering from a "common cold," as well as "[r]eactive airway disease," and she prescribed a "face mask and spacer" to use with Xopenex[8] and Albuterol.  (Tr. at 315-16).

On June 2, 2009, C.C. again saw Dr. Rivera-Davila.  (Tr. at 308-11).  Although his diabetes was under control that day, C.C. had experienced "some elevated blood sugars [during] th[e] past week."  (Tr. at 308).  He was also taking antibiotics and cough medicine at that time. (Tr. at 308).  Dr. Rivera-Davila directed Bailey to check C.C.'s glucose before meals and at bedtime, and she provided specialized instructions for treating his diabetes on "[s]ick [d]ay[s]." Dr. Rivera-Davila told Bailey to contact the clinic in three to four weeks to report C.C.'s glucose readings.  (Tr. at 311).

---

[8] "Xopenex" is "is a quick-relief medicine that is used to treat or prevent the narrowing of airways (bronchospasm) caused by asthma and chronic obstructive pulmonary disease (COPD) with reversible obstructed airway disease." Xopenex.com (last visited January 17, 2013).

On October 19, 2009, at the endocrinology clinic, Bailey said that C.C. had "stabbed his 2 y[ear] o[ld] sister in the back with a hair pick" three months earlier.  (Tr. at 369).  She also noted that C.C. "often fights [with his] older sibling and [] will sometimes choke his little sister." (Tr. at 369).   It is unclear which physician treated C.C. on that day, but Bailey received counseling on how to discipline C.C.  She was also referred for "help with her anxiety and possible depression."  (Tr. at 370).  At that visit, C.C. was said to have reached "[n]ormal 36-month milestones."  (Tr. at 370).  He "kn[e]w[] his name, age, and sex"; "dresse[d] with supervision"; and "use[d] pronouns."  (Tr. at 370).  C.C. could also "balance[] on one foot for ten seconds, and alternate[] [his] feet [when] walking up stairs."  (Tr. at 370).  However, he was unable to "copy a circle."  (Tr. at 370).

On September 14, 2009, Dr. Rivera-Davila wrote a letter to the Public Utility Commission of Texas, requesting that "the power to [C.C's] home not be discontinued as [it] will make his insulin [] ineffective."  (Tr. at 371-81).  In her letter, the doctor explained that "[w]ithout the proper refri[]geration the insulin will go bad and be unable to control his blood sugars.  This can lead to elevated blood sugars, diabetic ketoacidosis and even death."  (Tr. at 380).

The next month, Ms. Hughes recorded the following:

Mom here for Intensive Insulin management Training and Insulin Pump education as ordered by MD.  Mom still having problems with [C.C]'s angry behavior and aggression.  States she is having him tested for ADHD through pediatrician and will use referrals for psychology or psychiatry after that …. Discussed the following topics: Understanding Your A1c,[9] Beginning … Pump Therapy, Record Keeping, Calculating Insulin Sensitivity Factor and Insulin to Carbohydrate Ratio using worksheets, and deciding on target [b]lood glucose. Mom could only complete worksheet examples with assistance and had to be talked through each example; was not able to calculate doses independently.  …

---

[9] "The A1c test measures [] average blood glucose control for the past 2 to 3 months."  American Diabetes Association, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/a1c/ (last visited January 23, 2013).

> Mom is very eager to use the pump … [d]iscussed principles of insulin pumping and answered several questions about pump problems, what to do if pump fails, how to inject site, and very basic programming issues.  She wore an Inset to see how it felt, and successfully inserted it.  [W]ill discuss with Dr. Rivera-Davila if she is ready to proceed with ordering the pump.
>
> Would recommend set amount of carb[ohydrate]s at meals and set dose of insulin … In case of future pump failure, [t]his will take the error out of [the] family['s] struggle[es] to calculate [doses] .…  Mom may be able to do this down the road with more practice and experience.

(Tr. at 368).

On March 22, 2010, notes from the UT Endocrinology Clinic detail that C.C. "ha[d] been more aggressive," had "more temper tantrums," and was "having more hyperglycemia."[10]  (Tr. at 357).  Dr. Rivera-Davila prescribed new insulin doses for him, and told Bailey to contact the office within one week to report his blood sugar readings.  (Tr. at 360).

On March 25, 2009, Monica Fisher, M.D. ("Dr. Fisher") evaluated C.C. on behalf of the Social Security Administration.  (Tr. at 300-01).  She acknowledged that he suffered from type I diabetes and asthma, but found that, although these impairments were "severe," they did not meet, or medically or functionally equal, any of the applicable social security Listings.  (Tr. at 300).  Dr. Fisher found, specifically, that C.C. had no limitations in the areas of acquiring and using information, attending to and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  (Tr. at 302-03).  However, she did determine that he had a "marked" limitation in the area of "health and physical well-being." (Tr. at 303).  That finding was based on C.C.'s age, "which require[d] [his] parent to be extra vigilant as [he] cannot report feelings assoc[iated] with high or low bl[oo]d sugar."  (Tr. at 303).

On July 13, 2009, Patricia Nichol, M.D. ("Dr. Nichol") reviewed C.C.'s file, as part of the SSA's reconsideration of Bailey's application.  (Tr. at 331-36).  From her review of the

---

[10] The record also revealed that C.C. had been "homeless for a little while."  (Tr. at 357).

record, she also determined that C.C.'s diabetes was "severe," but echoed the finding that his condition did not meet, or medically or functionally equal, any of the applicable social security Listings.  (Tr. at 331).  Dr. Nichol repeated Dr. Fisher's finding that C.C. had no limitations in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  (Tr. at 333-34).  She concluded, however, that he had a "less than marked" limitation in the area of "health and physical well-being."  She based that finding on a report dated June 2, 2009.[11]  (Tr. at 334).  Dr. Nichol also noted that C.C.'s neurological reflexes and musculoskeletal exam were said to be normal, that he did "not complain of fatigue," and that he did not suffer from hypoglycemia or diabetic ketoacidosis[12]. [13]  (Tr. at 334); (Tr. at 309-10). From her review, Dr. Nichol concluded that C.C.'s limitations were only "partially supported" by the evidence.  (Tr. at 336).

There are also a number of logs which record C.C.'s blood glucose readings.  An entry from April 6, 2009, shows readings as low as 93 and as high as 492.  (Tr. at 407).  Another log, dated April 20, 2009, reveals readings that range from 53 to 455.  (Tr. at 405).  Finally, between August and October of 2009, most of the readings were over 100 mg/dL.  (Tr. at 375-79; Tr. at 382-83).

On March 17, 2011, Bomi K. Hormazdi, M.D. ("Dr. Hormazdi") diagnosed C.C. as suffering from ADHD.[14]  (Tr. at 422; see also Tr. at 421, 424-25).  Dr. Hormazdi noted that the disorder could be classified as "Predominantly Inattentive," "Predominantly Hyperactive-

---

[11] Although Dr. Nichol does not attribute the report to any specific doctor, C.C. did visit Dr. Rivera-Davila on that date.  (Tr. at 308-11).  However, some of the information from Dr. Rivera-Davila's notes is at odds with the information that Dr. Nichol cites.  For example, Dr. Nichol noted that, on June 2, 2009, C.C.'s blood glucose level was 250 mg/dl, however Dr. Rivera-Davila's tested C.C.'s blood glucose that day and found it to be 213 mg/dl.  *Compare* (Tr. at 334), *and* (Tr. at 308).  For that reason, it is unclear whether Dr. Nichol was relying on the record from Dr. Rivera-Davila in her assessment.

[12] "Diabetic ketoacidosis," also known as DKA, or "insulin shock," is "an acute life-threatening complication of uncontrolled diabetes mellitus," which often induces a "diabetic coma."  MOSBY's at 479.

[13] Dr. Rivera-Davila's notes from June 2, 2009 confirm these findings.  (Tr. at 309-10).

[14] Plaintiff submitted this record and the remainder of the medical evidence to the Appeals Council only.  (Tr. at 5).

Impulsive," or "Combined," which includes criteria from both the inattentive and hyperactive types.  (Tr. at 422) (emphasis omitted).  Dr. Hormazdi found that C.C. suffered from the "combined" type of ADHD, because he exhibited symptoms of inattention, hyperactivity, and impulsivity. (Tr. at 422).

On March 23, 2011, C.C. was examined by Maria J. Rendondo, M.D. ("Dr. Rendondo") at the Pediatric Endocrinology and Metabolism Clinic at Texas Children's Hospital.  (Tr. at 420). Dr. Rendondo reported that C.C. suffered from "ADHD" and type I diabetes, which was under "poor control."  (Tr. at 420).  Dr. Rendondo also detailed C.C.'s "history of moderate hypoglycemia," although his "[p]hysical exam was remarkable for lipohypertrophy."[15]  (Tr. at 420).  She was "[u]nable to make recommendations on insulin dose[s] due to [a] lack of information on blood sugars." (Tr. at 420).  Dr. Rendondo reported that, since his initial diabetes diagnosis, C.C. "has been admitted to the Hospital twice for hypoglycemia with moderate symptoms (inability to swallow[,] but no seizure or loss of consciousness)."  (Tr. at 417).  She also notes that C.C. was taken from pre-K to daycare, because his "school was not helping with his diabetes needs."  (Tr. at 419).  Bailey told Dr. Rendondo that she had "los[t] three jobs due to" C.C.'s diabetes complications.  (Tr. at 419).

### *Educational Background and Present Age*

C.C. was born on April 9, 2006.  (Tr. at 239). At the time of the administrative hearing, he was four years old, and attended a day care program at the elementary school where his grandfather was vice principal.  (Tr. at 84, 88).  A school attendance report shows that low blood sugar caused C.C. to be absent two days in March and April of 2011, and that he was sent home early another day in April 2011 because of low blood sugar.  (Tr. at 427).

---

[15] "Lipohypertrophy" is "a build-up of subcutaneous fat tissue at the site of an insulin injection."  MOSBY'S at 946.

*Subjective Complaints*

At the hearing before the ALJ, on June 25, 2010, Bailey testified that there were no complications with C.C's birth, but that she began to notice problems with his health in January 2009.  (Tr. at 58).  At that time, C.C. "was drinking gallons of water," and "urinating too much."  Bailey took C.C. to his pediatrician, Dr. Nguyen, and a "urine test" showed his glucose level to be 700.  (Tr. at 58).  Bailey testified that C.C. was then transported by ambulance to the hospital "because he could have gone into a [d]iabetic coma."  (Tr. at 59).  After undergoing tests at West Houston Medical Center, C.C. was transferred to Memorial Hermann Children's Hospital.  (Tr. at 59).  At Memorial Hermann, C.C. was diagnosed as suffering from "Juvenile Onset Diabetes mellitus" and "asthma exacerbation."  (Tr. at 61).  Upon receiving these diagnoses, Bailey attended "a nutrition class," and a "class on how to take care of [C.C.] when [they] got home."  (Tr. at 62).  Bailey learned how to use a syringe to inject insulin.  (Tr. at 62).  After C.C.'s release from the hospital, Bailey gave him insulin injections twice a day.  (Tr. at 63).  According to Bailey, once C.C.'s shot was administered, she "had to monitor him for [] the next two hours to make sure … [that his blood sugar] didn't drop too low or [] didn't go too high."  (Tr. at 63).  During those two hours, C.C. could not "go outside and play," nor could he "play with other children, even at her own house." (Tr. at 66, 72).  In fact, Bailey told the ALJ that C.C. "could really get sick if [she] do[es]n't make him sit down," and that "because he gets really aggressive … [she] can't let him be around [her] other two children."  (Tr. at 72).

Bailey then testified that when C.C.'s blood sugar was too high, Bailey gave him more insulin, and that when it was too low, she "give[s] him sugar."  (Tr. at 63).  Sometimes the shots cause C.C. to "throw up," and if so, Bailey has to "administer [an] emergency kit into his leg" to "wake[] him back up because he [] w[ould] fall asleep … and [] pass out."  (Tr. at 63-64).

Bailey explained that the "emergency kit" is used during a "[h]ypoglycemia attack," when C.C.'s blood sugar is too low, and he "won't []take anything through [the] mouth." (Tr. at 64). Bailey testified that any glucose reading between 20 and 100 was "in the [h]ypoglycemic range," and that C.C. suffered from hypoglycemic attacks about twice a month. (Tr. at 65). During those attacks, C.C. "faint[s]," "speak[s] like a baby," or becomes "very lethargic." (Tr. at 79). Bailey told the ALJ that C.C. has never gone into shock, because she has always "caught [his attacks] in time." (Tr. at 79). Bailey testified that the last time they went to the emergency room for hypoglycemia was on March 22, 2010. (Tr. at 79). At that visit, C.C. was admitted for observation for one day only. (Tr. at 80). Bailey also testified that she has had to take C.C. to the doctor "on an emergency basis" a number of times. (Tr. at 67). On such occasions, C.C. does not respond, his speech is "slur[red]," and "he can't tell [her] what's wrong." (Tr. at 67). In September 2009, C.C.'s blood sugar was so low that he would not "[]take anything [] by mouth," and he began "throwing up." (Tr. at 68). C.C. again went to the hospital and they gave him an I.V. to stabilize his blood sugar. (Tr. at 68).

Bailey testified that C.C. had been "in summer camp for the past two weeks," and that during the previous year, he had been in daycare from August through November of 2009. (Tr. at 66). Bailey reported that she "lost [her] last job," because the daycare center required her to pick up C.C. if his blood sugar was not stable. (Tr. at 66). She had to leave work about "four times out of a week," and her employer told her that she "had too many issues and [] could no longer work there." (Tr. at 67). After losing her job, Bailey claimed to "hav[e] problems paying [her] bills." (Tr. at 69). She testified that her "light bill" rose to "$400-$500 dollars," so the doctor wrote a letter asking that the service be continued. (Tr. at 69).

Bailey told the ALJ that C.C. was now enrolled in a "Pre-K program" at Jenard Gross Elementary, a "regular elementary school" in Houston.  (Tr. at 71).  C.C's grandfather, Leon Cavitt ("Cavitt"), is the vice principal of that school.[16]  (Tr. at 71).  Bailey told the ALJ that Cavitt administers C.C.'s morning insulin shot and then watches him for two hours.  (Tr. at 71).  Bailey testified that she goes to the school at lunch to give him another shot, and stays afterward to watch him.  C.C. receives his final shot at dinner time.  (Tr. at 71).

In addition to his medication, C.C. also follows a special diet.  (Tr. at 72).  He has to eat a certain amount of carbohydrates throughout the day, and if he does not, he "could get really sick."  (Tr. at 73, 75).  Bailey told the ALJ that C.C.'s physician, Michelle Rivera-Davila, prescribed his treatment plan.  (Tr. at 77).  She also testified that Dr. Rivera-Davila told her that C.C. will never "be able to run and play like other children."  (Tr. at 78).  At home, she "sometimes" lets C.C. go outside, but not for more than an hour.  (Tr. at 78).  When C.C. reaches 11 or 12 years old, she will "teach him how to administer his own shots."  (Tr. at 72).

Bailey also reported that C.C.'s asthma treatment interferes with his diabetes treatment, because he cannot take his congestion medicine or any cough syrups.  (Tr. at 68-69).  She explained that those medications are "too sweet" and "make[] his blood sugar" spike. (Tr. at 68). Bailey also testified that C.C. took Albuterol about "twice a year," when he has "a cough."  (Tr. at 69).  Bailey told the ALJ that C.C. has "[a]sthmatic attacks" about "three or four times" per year, but that the condition was "pretty well … under control."  (Tr. at 69).  His regular treatments usually ward off asthma attacks, and he does not suffer side effects from those treatments.  (Tr. at 78).

---

[16] Bailey testified that Cavitt was the principal, but Cavitt later testified that, in fact, he was the vice principal.  (Tr. at 71).

Finally, Bailey testified that, in February, she had had C.C. tested for attention deficit disorder, but that the doctors told her "there was nothing." (Tr. at 52). Instead, the doctors attributed C.C.'s aggressive behavior to "his sugar being just a little too high." (Tr. at 53).

### Testimony from Leon Cavitt, Jr.

At the hearing, the ALJ also heard testimony from Leon Cavitt, Jr., C.C.'s paternal grandfather. (Tr. at 82-94). Cavitt earned an undergraduate degree from the University of Houston as well as a Masters degree in from the University of St. Thomas. (Tr. at 84). Cavitt testified that he has worked for the Houston Independent School District since 1998, and that he is currently the Vice Principal at [J]enard Gross Elementary School. (Tr. at 84). Cavitt told the ALJ that C.C. had moved in with him, "about a month" before the hearing, because he wanted him to receive "the support that he needed [] since his dad is incarcerated." (Tr. at 85). Before that, C.C. would "spen[d] time with his Paw Paw" on the weekends. (Tr. at 85). When C.C. was with him on the weekends only, Cavitt was always "aware of what had to be done as far as [C.C.'s] medical treatment." (Tr. at 91). He stated that, "it's just a matter now of doing it full time." (Tr. at 91). Cavitt confirmed that C.C. attends the summer program at his school. (Tr. at 85). He verified that he gives C.C. his first insulin shot at 6:30 in the morning, but that to administer the medicine, he must "prep [C.C.] and calm him down." (Tr. at 87). According to Cavitt, C.C. needs calming, because he is only four years-old and has "been stuck so much." (Tr. at 87). He testified that,

> [Y]ou have to stick the finger to get the blood sample then you have to give him a shot in the muscle with the Insulin; so it's just a matter of emotionally prepping him and calming him down because … [although] he's been doing it now for two years[,] … for a four year old, [i]t's a big ordeal.

(Tr. at 87).  After giving him a shot, Cavitt has to observe C.C. for "about 15 minutes," because "sometimes the medication will make him throw up" or "make his stomach hurt."  (Tr. at 87).  Because C.C. "has to have a snack after the medication," Cavitt stated that he usually observed his grandson while "he's sitting at the table getting ready to eat."  (Tr. at 87).  After this waiting period, Cavitt brings the insulin to the nurse to be refrigerated, and then takes C.C. "to the daycare."  (Tr. at 88).  He stated that, "[t]he teachers at the school … know [him] and [] are familiar with [his] [g]randson."  (Tr. at 88).  If anything happens to C.C., the teachers bring him to the nurse, who is "well-trained," and she takes care of him.  (Tr. at 88).  A "couple of times," however, C.C "threw up and [Cavitt] [] had to go in and take him a change of clothes."  (Tr. at 88).  Because the child is "only allowed 45 grams of carbohydrates at each serving," he also works with the dietician to monitor C.C.'s diet.  (Tr. at 89).  Finally, Cavitt testified that C.C. has had asthma, but "[n]ot at school."  (Tr. at 90).  Although C.C. receives asthma treatments, Cavitt has never had to administer them.  (Tr. at 90).

Cavitt told the ALJ that he "already registered [C.C.] in [the] Pre-K program" at his school.  (Tr. at 91).  He testified that C.C. is behind cognitively, because he does not know "his letters" or "sounds."  (Tr. at 91).  Cavitt stated that the school is "working with him now on that."  (Tr. at 91).  Cavitt also explained that C.C. can be "aggressive," and he attributed that behavior to "some of the things emotionally that he has to go through with being [] stuck so much."  (Tr. at 92).  For instance, Cavitt stated that,

> Today when I went to get him to bring him in, he thought he was going to be stuck and he was saying oh no no, and I said no it's not time for your Insulin shot, we got to go to a meeting.  He was like oh, okay.  So I think that right there makes him a little bit more aggressive.  He sees that he has to do a lot of things that his sister doesn't have to do.

(Tr. at 92).  Cavitt also told the ALJ that he thought C.C.'s aggressive behavior might be due to the fact that "his body [is] not [] able to produce the Insulin" that he needs.  (Tr. at 92-93).  Cavitt then stated that C.C.'s aggression had "gotten better now that he understands … a little bit more [] [about] why[,] even though he doesn't like [his condition], … [it] is going to be something that he has to deal with."  (Tr. at 93).

With that answer, Bailey's attorney confirmed that the ALJ had a "complete record," and the hearing ended.  (Tr. at 94, 96).


***The ALJ's Decision***

Following the hearing, the ALJ made written findings on the evidence.  (Tr. at 25-37).  From his review of the record, the ALJ found that C.C. had not engaged in any substantial gainful activity since February 13, 2009, the application date.  (Tr. at 28).  He also determined that C.C. suffered from diabetes mellitus and asthma, and that these conditions were "severe." (*Id.*).  However, the ALJ found that none of C.C.'s impairments, alone or in combination, met the criteria of any impairment "listed in 20 CFR 404 Subpart P, Appendix 1."  (Tr. at 29).  In making that determination, the ALJ considered C.C.'s limitations in the context of the six domains of child functioning.  (Tr. at 31-37).  He found that C.C. was not limited under any domain except the last one, which is related to general health and well being.  The ALJ found, however, that his limitations in this domain are "less than marked."  (Tr. at 37).  The ALJ concluded that, because C.C. suffered no marked limitations under any of the domains, he was not disabled within the meaning of the Act.  (Tr. at 37).  With that conclusion, he denied the application for SSI benefits.  (*Id.*).

Before this court, Bailey asks the court to reverse the Commissioner's decision and to award benefits for her son, or in the alternative, to remand this case for further proceedings. (*Id.* at 1). She contends that the ALJ erred in determining that C.C.'s diabetes did not meet or medically equal Listing 109.08. (*Id.* at 4). Defendant insists, however, that the ALJ properly considered all of the evidence, and followed the applicable law, in determining that C.C. is not disabled. (Defendant's Motion at 9); (Defendant's Response at 13).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

### Listing 109.08

At the outset, it is critical to point out that, after the ALJ issued his decision, and before the Appeals Council denied review, the SSA adopted new regulations on diabetes. These changes eliminated diabetes mellitus as a listed impairment, except in the case of children under six years of age. 76 Fed. Reg. 19692-01 (effective June 7, 2011). Before that change, the Listing required evidence of "recent, recurrent episodes of hypoglycemia" before a child with juvenile diabetes would be found disabled. 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 109.08

(2010).  Currently, however, any child who is six years old or younger, and who requires daily insulin, is considered to have met Listing 109.08.[17]

In this case, the ALJ applied the version of Listing 109.08, which was in effect at the time.  (Tr. at 25-37).  Bailey argues, however, that, because the new Listing became effective before the Appeals Council denied her request for review, that revised Listing should be applied to her case.  Defendant does not argue that Bailey does not meet the revised Listing 109.08.  Instead, the Commissioner claims that the previous Listing should apply because it was effective at the time of the ALJ's decision.  He emphasizes that, the Fifth Circuit has consistently held that, "courts will not apply regulations retroactively unless their language so requires." *Hernandez-Rodriguez v. Pasquarell*, 118 F.3d 1034, 1042 (5th Cir. 1997) (citing *Sierra Medical Center v. Sullivan*, 902 F.2d 388, 392 (5th Cir. 1990).  Defendant relies on the Fifth Circuit's decision in *Boyd v. Apfel*, for the proposition that a regulation change cannot be applied retroactively.  In *Boyd*, the Fifth Circuit addressed a case in which the regulation at issue had been amended since the plaintiff's hearing.  *Boyd*, 239 F.3d 698, 705 n. 11 (5th Cir. 2001). However, the effective date of that amendment was after the Appeals Council action.  *See id*.

Here, at the time Listing 109.08 was amended, the SSA provided the following instructions to help determine which version should be used:

> We will use these final rules beginning on their effective date. We will continue to use the current listings until the date these final rules become effective. We will apply the final rules to new applications filed on or after the effective date of the final rules *and to claims that are pending on and after the effective date*....
>
> *This means that we will use these final rules on and after their effective date in*

---

[17] The revised Listing is set out below:

> Any type of diabetes mellitus in a child who requires daily insulin and has not attained age 6. Consider under a disability until the attainment of age 6. Thereafter, evaluate the diabetes mellitus according to the rules in 109.00B5 and C.

*See* 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 109.08 (2013).

> *any case in which we make a determination or decision.* We expect that Federal
> courts will review our final decisions using the rules that were in effect at the time
> we issued the decisions. If a court reverses our final decision and remands a case
> for further administrative proceedings after the effective date of these final rules,
> we will apply these final rules to the entire period at issue in the decision we make
> after the court's remand.

76 FR 19692-93 (emphasis added).    The Fifth Circuit has recognized that "the Commissioner's decision does not become final until after the Appeals Council makes its decision denying the claimant's request for review."  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) (citing 20 C.F.R. § 416.1400).  In this instance then, the revisions to Listing 109.08 became effective on June 7, 2011, and the Appeals Council issued its decision on September 21, 2011.  76 Fed. Reg. 19692-01; (Tr. at 1).  Clearly, the Commissioner's decision was not final on the effective date of the revised Listing.

But, in its ruling, the Appeals Council stated that it "applied the laws, regulations and rulings in effect as of the date we took this action."  (Tr. at 1).  There can be little dispute that the Appeals Council was required to apply Listing 109.08, as revised, to C.C.'s case.  *See Rushing v. Astrue*, , 2008 WL 474363, at *4 (W.D. La. Feb. 19, 2008) (remanding the case when the applicable Listing changed between the ALJ's decision and the Appeals Council's action, and the Appeals Council did not apply the revised Listing). It bears repeating that, under the new Listing 109.08, any child who is under six years of age, meets the Listing if he suffers from diabetes which requires daily insulin injections. 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 109.08 (2013).  On this record, there is no question that C.C. was four years old at the time of the ALJ hearing, on June 25, 2010, and five years old at the time of the Appeals Council's review, on September 21, 2011. (Tr. at 1, 47, 49, 239).  The evidence is uncontroverted that C.C. suffers from diabetes mellitus and needs daily insulin injections to survive.  Indeed, Defendant does not dispute

that C.C. would meet Listing 109.08, as revised.  *See* (Defendant's Motion; Defendant's Response).  C.C. has shown that he would be entitled to receive disability benefits under the current version of the Listing.  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 109.08 (2013).

In *Audler v. Astrue*, the Fifth Circuit explained that, when issuing an unfavorable determination, the Commissioner must discuss the evidence and state his reasons for the decision.  *Audler*, 501 F.3d 446, 448 (5th Cir. 2007).  Although "[p]rocedural perfection … is not required" in this process, any omission cannot affect a party's substantial rights.  *Id*.  Here, C.C. has shown that he met revised Listing 109.08, but the Appeals Council did not discuss that version of the Listing.  (Tr. at 1-6).  For that reason, his right to benefits appears to have been affected and the Commissioner's decision should be remanded to address the proper version of Listing 109.08.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  With this finding, it is RECOMMENDED that Plaintiff's Motion for Summary Judgment be GRANTED, and that Defendant's Motion for Summary Judgment be DENIED.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**, so that the case can be remanded to apply the current Listing 109.08.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c)), General Order 02-13, S.D. Texas.

Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 28th day of January, 2013.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**